**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HEALTHCARE ALLY
MANAGEMENT OF
CALIFORNIA, LLC,

*Plaintiff - Appellant*,

v.

WSP USA, INC.; AETNA LIFE
INSURANCE COMPANY,

*Defendants - Appellees*.

No. 24-3479

D.C. No.
2:22-cv-04814-
DMG-PVC

OPINION

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted August 22, 2025
Pasadena, California

Filed August 11, 2026

Before: Marsha S. Berzon, Stephen A. Higginson, and
Jennifer Sung, Circuit Judges.[*]

---

[*] The Honorable Stephen A. Higginson, United States Circuit Judge for the U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

Opinion by Judge Berzon

**SUMMARY**[**]

**Employee Retirement Income Security Act /
Preemption**

The panel affirmed in part and reversed in part the district court's dismissal and remanded for further proceedings in an action brought under the Employee Retirement Income Security Act ("ERISA") and California state law by Healthcare Ally Management of California, LLC ("HAMOC"), against WSP USA, Inc., and Aetna Life Insurance Co.

The case arose from a dispute over the proper payment rate for a surgery that took place at the La Peer Surgery Center. At the time, the patient was enrolled in an ERISA healthcare plan provided by the patient's employer, WSP, and Aetna administrated the plan. Before providing out-of-network surgical services, La Peer placed a verification call to Aetna, which told La Peer that the patient would cover a portion of the surgery but that WSP's plan would pay the remaining balance at the usual, customary, and reasonable rate and that payment would not be based on the Medicare fee schedule. Contrary to Aetna's representation, however, WSP paid La Peer not at the USR rate, but at the Medicare rate, which amounted to five percent of La Peer's bill.

HAMOC, La Peer's successor in interest, brought suit. The district court held that HAMOC lacked derivative

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

standing to assert an ERISA claim on La Peer's behalf and dismissed that claim. The district court dismissed the remainder of HAMOC's complaint pursuant to Fed. R. Civ. P. 12(b)(6), concluding that the state law claims necessarily depended on the existence of an ERISA-covered plan and so were preempted by ERISA.

Under 29 U.S.C. § 1144(a), ERISA preempts all state laws that "relate to" any healthcare plan regulated by the statute. The two categories of state-law claims that "relate to" an ERISA plan are claims that have a "reference to" an ERISA plan and claims that have "an impermissible connection with" an ERISA plan.

Reversing in part, the panel held that ERISA did not preempt HAMOC's negligent misrepresentation claim, which arose from coverage representations made to an out-of-network medical provider during a verification call in advance of medical services. Because this claim did not focus on an ERISA-regulated relationship, it was not preempted under the "connection with" test. Agreeing with other circuits, the panel concluded that the negligent misrepresentation claim was not preempted under the "reference to" test because it was not a claim that Congress could have intended to route through ERISA's civil enforcement scheme. Rather, HAMOC was simply an independent entity claiming damages. The panel explained that the result it reached accorded with the underlying premises of ERISA preemption. The panel distinguished *Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, 103 F.4th 597 (9th Cir. 2024), which held that ERISA preempted state law breach of contract and promissory estoppel claims.

Affirming in part, the panel held that under *Bristol*, ERISA preempted HAMOC's California state law claim of promissory estoppel.

---

**COUNSEL**

Jonathan A. Stieglitz (argued), Stieglitz Law, Los Angeles, California, for Plaintiff-Appellant.

Jonathan M. Herman (argued) and Joel A. Mintzer, Herman Law Firm, Los Angeles, California, for Defendants-Appellees.

---

**OPINION**

BERZON, Circuit Judge:

The Employee Retirement Income Security Act of 1974 ("ERISA") contains a provision that expressly preempts all state laws that "relate to" any healthcare plan regulated by the statute. 29 U.S.C. § 1144(a). We consider whether ERISA preempts a state law negligent misrepresentation claim that arises from coverage representations made to an out-of-network medical provider in advance of medical services. We hold that ERISA does not preempt the claim and so reverse.

## I

This case arises from a dispute over the proper payment rate for a surgery that took place at the La Peer Surgery

Center.[1] At the time, the patient was enrolled in an ERISA healthcare plan provided by the patient's employer, defendant WSP USA, Inc. Defendant Aetna Life Insurance Company administered WSP's healthcare plan by coordinating with medical providers like La Peer and processing those providers' reimbursement claims under the terms of WSP's health benefit plan.

As is common practice in the health insurance industry, WSP's healthcare plan differentiated "in-network" providers from "out-of-network" providers, a distinction that determines how the plan reimburses providers for the medical services they perform. In-network providers enter written preferred-provider contracts with healthcare plans and agree to accept discounted reimbursements for their services. In exchange for these discounts, the plans provide incentives for their members to seek in-network treatment, thereby increasing the total volume of an in-network provider's business.

By contrast, out-of-network providers do not have preexisting contractual agreements in place with a given healthcare plan. Insurers often reimburse out-of-network providers a percentage of the market rate for a given procedure, but such providers can charge higher rates because, unlike in-network providers, they have not agreed in advance to accept discounted reimbursements. Out-of-network providers typically receive from insurers the

---

[1] This appeal comes to us from an order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). We therefore "accept as true" the "well-pleaded allegations of material fact" in the operative, third amended complaint and "construe [those facts] in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

"Usual, Customary, and Reasonable" ("UCR") rate for their services, a term that denotes the average amount paid for a specific procedure in a given geographic area based on what other providers in that area charge for the same service, but Medicare coverage can affect whether the UCR rate applies.[2] Because out-of-network providers lack contractual reimbursement agreements with healthcare plans, they often place a "verification call" to the plan administrator before performing a procedure to confirm that the patient is eligible for coverage, to ascertain that the particular procedure is covered, and to learn the likely reimbursement rate.

La Peer provided out-of-network surgical services for the patient in this case.[3] Before doing so, La Peer placed a verification call to Aetna to confirm that the patient's plan would pay the surgery center for the procedure. On that call, Aetna told La Peer that the patient would cover a portion of the surgery as an out-of-pocket expense but that WSP's plan would pay the remaining balance at the UCR rate.[4] Aetna

---

[2] For a patient covered by both Medicare and by employer-sponsored healthcare, the rate paid to the provider may depend on which insurance is considered the patient's "primary" insurance. *See* Ctrs. for Medicare & Medicaid Servs., *How Medicare Works with Other Insurance*, 1, 4 (Feb. 2026), https://www.medicare.gov/publications/02179-how-medicare-works-with-other-insurance.pdf [https://perma.cc/5NSY-UVZN].

[3] The dispute here arises from a phone call between La Peer and Aetna. Neither the patient nor La Peer is a party to this litigation. The patient assigned their reimbursement rights to La Peer, who in turn assigned those rights to plaintiff Healthcare Ally Management.

[4] The complaint does not specify whether La Peer told Aetna that the patient was Medicare-covered or Medicare-eligible. The complaint does state that neither defendant informed La Peer of any provision in the patient's health insurance policy that limited the method of payment for services provided.

also told La Peer that "payment would not be based on the Medicare Fee Schedule."[5] Neither Aetna nor WSP informed La Peer before the surgery that the plan contained exclusions, limitations, or qualifications that might reduce or otherwise impact Aetna's promised UCR reimbursement rate. Nor did Aetna or WSP provide La Peer with a copy of the plan before the surgery.

After receiving assurance that WSP's plan would pay for the surgery at the UCR rate, La Peer moved forward with the procedure. La Peer then sent a bill to WSP. Sometime later, WSP paid La Peer for the patient's surgery. Contrary to Aetna's representation in its phone call with La Peer, WSP paid La Peer not at the UCR rate but, instead, at the Medicare rate, which amounted to five percent of La Peer's bill. The complaint does not state whether WSP provided an explanation for paying at the Medicare rate or, if so, what that explanation was.

Healthcare Ally Management of California ("HAMOC"), La Peer's successor in interest, sued both WSP and Aetna in California state court, initially asserting only state law claims. After WSP removed the case to federal court on federal question grounds—ERISA complete preemption, *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66 (1987)—and diversity grounds, HAMOC amended its complaint to "remove those causes of action that are preempted by [ERISA]," including a breach of contract

---

[5] The Medicare Fee Schedule is a list developed by the Centers for Medicare & Medicaid Services that specifies the maximum reimbursement rates that Medicare will pay providers for their services. *See* Ctrs. for Medicare & Medicaid Servs., *Fee Schedules* (2025), https://www.cms.gov/medicare/payment/fee-schedules [https://perma.cc/EAY2-3FK7]. The Medicare Fee Schedule typically specifies a lower rate of payment than does the UCR.

claim and a claim brought pursuant to California's Unfair Competition Law. The operative, third amended complaint asserts two state law claims: negligent misrepresentation and promissory estoppel. HAMOC also asserts a third cause of action for failure to pay ERISA plan benefits under 29 U.S.C. § 1132(a)(1)(B).

The district court held that HAMOC lacked derivative standing to assert an ERISA claim on La Peer's behalf and so dismissed that claim.[6] The court dismissed the remainder of HAMOC's complaint pursuant to Rule 12(b)(6), concluding that the state law claims "necessarily depend on the existence of an ERISA-covered plan" and so were preempted. *Healthcare Ally Mgmt. of Cal., LLC v. WSP USA, Inc.*, No. CV 22-4814-DMG, 2024 WL 2880204, at *4 (C.D. Cal. May 1, 2024). ERISA preemption is "a question of law that we review *de novo*." *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009).

## II

Congress enacted ERISA in 1974 to protect the interests of those who receive health insurance through their employers. *See* 29 U.S.C. § 1001. Recognizing "that the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans," *id.* § 1001(a), Congress designed a statute that "comprehensively regulates . . . employee welfare benefit plans that . . . provide medical, surgical, or hospital care" to their beneficiaries, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987). In particular, ERISA "establish[es] standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b).

---

[6] HAMOC does not appeal this ruling.

Among other things, ERISA's substantive provisions require health insurance plans to disclose certain information to covered individuals, to compile and file annual financial reports with the Secretary of Labor, and to adhere to a variety of standards of conduct and fiduciary duties. *See, e.g.*, *id.* §§ 1021–1032, 1102(a), 1104. To that end, ERISA includes several provisions that together operate to "provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Two of those provisions are principally relevant here.

First, ERISA protects the interests of "participants" and "beneficiaries"—those entitled to benefits under an employee welfare plan—by setting forth a "comprehensive civil enforcement scheme." *Pilot Life*, 481 U.S. at 54. That scheme—ERISA § 502, 29 U.S.C. § 1132—authorizes certain individuals and entities to bring suit for various reasons.[7] For our purposes, ERISA specifies two parties that may bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a). Those parties include plan "participant[s]" and plan "beneficiar[ies]," *id.*, titles which generally refer to individuals eligible to receive benefits, like medical care, under the terms of an employee benefit plan, *see id.* § 1002(7)–(8).

Section 502(a)'s specification that particular parties may sue under ERISA "represents a careful balancing" of interests encompassed by ERISA's civil enforcement regime. *Pilot Life*, 481 U.S. at 54. The Supreme Court has recognized that this scheme "would be completely undermined if ERISA-plan participants and beneficiaries

---

[7] For example, a participant, beneficiary, or fiduciary may sue a plan to enjoin practices which violate ERISA or to obtain equitable relief to enforce provisions of ERISA. *See* 29 U.S.C. § 1132(a)(3).

were free to obtain remedies under state law that Congress rejected in ERISA." *Id.* Critically, "health care providers" like surgical centers, doctors' offices, and hospitals "are not 'beneficiaries' within the meaning of ERISA's enforcement provisions." *DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 874 (9th Cir. 2017). That is the case even when an ERISA participant or beneficiary receives plan-covered treatment from a provider for which the provider later receives reimbursement from an insurance company. Remuneration to a "medical provider for services rendered is not properly termed a 'benefit' to the provider," such that § 502(a) would vest in providers the direct authority as beneficiaries to bring suit. *Id.* at 874–75. The upshot is that ERISA does not establish a cause of action for medical care providers who contend that an ERISA plan or its administrator, often an insurance company, has not paid, or has paid too little, for covered healthcare.

This gap in ERISA's enforcement system has led providers to seek various ways to litigate payment disputes with ERISA plans and their administrators. From the provider's perspective, the most straightforward way to litigate such disputes is for the patient to assign to the provider their § 502(a) right to sue. "ERISA does not forbid assignment by a beneficiary of his right to reimbursement under a health care plan to the health care provider." *Misic v. Bldg. Serv. Emps. Health & Welfare Tr.*, 789 F.2d 1374, 1377 (9th Cir. 1986) (per curiam). So a provider seeking to sue a plan or plan administrator for benefits under § 502(a) often can "do so derivatively, relying on its patients' assignments of their benefits claims." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289 (9th Cir. 2014).

But the assignment solution does not always work. Plans can foreclose such assignments by including an "express non-assignment clause in the plan." *Davidowitz v. Delta Dental Plan of Cal., Inc.*, 946 F.2d 1476, 1481 (9th Cir. 1991). In that circumstance, a provider cannot sue under § 502(a) and must instead resort to a different cause of action. Such causes of action take different forms, often depending upon whether the provider is in-network or out-of-network with regard to the relevant health benefit scheme.

In-network providers enter separate contractual agreements with their patients' employee benefit plans. Those agreements specify rates at which providers will accept and plan administrators will pay for services rendered under an employee benefit plan. *See, e.g.*, *Blue Cross of Cal. v. Anesthesia Care Assocs. Med. Grp., Inc.*, 187 F.3d 1045, 1048 (9th Cir. 1999) (describing in-network provider agreements); *Bristol SL Holdings, Inc. v. Cigna Health & Life Ins. Co.*, 103 F.4th 597, 599–600 (9th Cir. 2024) (same). When a provider disputes the plan administrator's payment for ERISA-plan covered services, that provider can do so by bringing a cause of action, alleging that the plan breached the provider agreement. Such breach of contract claims "arise from the terms of [the] provider agreements[,] . . . are not claims for benefits under the terms of ERISA plans," and have been held not preempted by ERISA. *Blue Cross of Cal.*, 187 F.3d at 1050. Thus, even when ERISA-plan benefits are at issue, in-network providers have a remedy other than a derivative § 502(a) benefits claim.

Out-of-network providers, on the other hand, have no direct contracts with ERISA plans. When a dispute arises, "the terms of the benefit plan [are] the provider's only basis for [a] reimbursement claim." *Id.* at 1051. Assignment makes it "unnecessary for health care providers to evaluate

the solvency of patients before commencing medical treatment." *Misic*, 789 F.2d at 1377. So out-of-network providers regularly seek assignment of benefit rights from their patients. *See, e.g.*, *Spinedex Physical Therapy*, 770 F.3d at 1288.

But what happens when out-of-network providers provide healthcare services to patients whose plans do not allow assignments? In such instances, providers can sometimes succeed in enforcing an assignment; a plan administrator "waive[s] the right to enforce an anti-assignment provision" if the administrator is aware of the assignment yet fails to "raise the anti-assignment provision as a basis to deny benefits" during claim processing. *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 440–41 (9th Cir. 2020). Absent a waiver, however, out-of-network providers may lack any ability to recover from the plans directly.[8]

Providers can, of course, require up-front payments from their patients, who in turn can file a claim for reimbursement with their employee benefit plan for the benefits due to them. *See Misic*, 789 F.2d at 1377. Even then, out-of-network providers regularly verify with plan administrators whether their patients are covered and at what level. That practice allows the providers to determine a patient's total cost burden, adjudge the patient's likely ability to meet it, and determine whether they will bill the patient or the insurance provider for the procedure.

---

[8] Here, La Peer had a different problem: It assigned claims for collection to a third party, HAMOC, that lacked derivative standing to sue as an assignee under ERISA.

Attempts by out-of-network providers to secure from ERISA plans payment they allege is owed for services rendered to plan-covered patients have given rise to a myriad of lawsuits in which such providers have asserted various state law causes of action. *See, e.g.*, *The Meadows v. Emps. Health Ins.*, 47 F.3d 1006 (9th Cir. 1995) (negligent misrepresentation, estoppel, and breach of contract); *Marin Gen. Hosp. v. Modesto & Empire Traction Co.*, 581 F.3d 941 (9th Cir. 2009) (negligent misrepresentation, estoppel, breach of contract, and quantum meruit); *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643 (9th Cir. 2019) (fraudulent inducement, constructive fraud, negligent misrepresentation, unjust enrichment, and unfair trade practices); *Bristol*, 103 F.4th 597 (breach of oral contract, breach of implied contract, and promissory estoppel); *Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812 (9th Cir. 1992) (negligence, unfair practices, tortious interference with contract, conversion, and estoppel). This case arises from one such suit—a suit for negligent misrepresentation and promissory estoppel under state law, premised on alleged representations made by an ERISA plan administrator to an out-of-network service provider during a verification call.

The potential barrier to such a lawsuit is the principal statutory provision relevant to this case, ERISA's famously expansive preemption clause. 29 U.S.C. § 1144(a). That provision specifies that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan" covered by ERISA. *Id.* Where a federal law like ERISA conflicts with and therefore preempts a state law, that state law is "without effect." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) (quoting *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013)).

The text of ERISA's preemption clause, "and in particular, the phrase 'relate to,' is broad." *Depot*, 915 F.3d at 665. So broad, in fact, that "applying the 'relate to' provision according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring). To avoid the doomsday problem of relational overreach, the Court has sought to provide "workable standards" for determining the scope of § 1144(a), *Depot*, 915 F.3d at 665 (citation omitted), lest ERISA's preemptive effect "pick up every ripple in the pond, producing a result that no sensible person could have intended." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 153 (2001) (Scalia, J., concurring) (citation modified). Under those standards, we have said, there are "'two categories' of state-law claims that 'relate to' an ERISA plan—claims that have a 'reference to' an ERISA plan, and claims that have 'an impermissible connection with' an ERISA plan." *Depot*, 915 F.3d at 665 (citation modified) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319–20 (2016)).

But identifying those categories hasn't resulted in clarity in applying ERISA's express preemption provision. Much like the "unhelpful text and the frustrating difficulty of defining" the preemption clause's "relate to" term, *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995), the "reference to" and "connection with" tests lack easily ascertainable bounds. The Supreme Court has accordingly cautioned against "uncritical literalism" that would extend ERISA's preemption clause to "infinite relations" or "infinite connections." *Id*. Instead, courts must "go beyond" the text

of the statute and also beyond the short-form tests meant to cabin statutory overreach, and look "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1007 (9th Cir. 1998) (quoting *Travelers*, 514 U.S. at 656), "as well as to the nature of the effect of the state law on ERISA plans," *Cal. Div. of Lab. Standards Enf't*, 519 U.S. at 325. *See also Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 980–81 (9th Cir. 2001). "[T]he purpose of Congress is the ultimate touchstone" in every preemption analysis. *Waks v. Empire Blue Cross/Blue Shield*, 263 F.3d 872, 874–75 (9th Cir. 2001) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987)); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990).

With those practical considerations and preemption precepts in mind, we turn to considering whether ERISA preempts HAMOC's state law claim of negligent misrepresentation.

## III

The state law claim here at issue is California's tort of negligent misrepresentation. With some trepidation given the imprecision of the "connection with" and "refer to" tests meant to implement ERISA's "relate to" preemption standards, we shall begin by trying to apply those two standards to the California negligent misrepresentation claim HAMOC seeks to litigate, looking closely to cases that have applied those tests.**[9]** We then turn to a more holistic,

---

[9] *Bristol SL Holdings, Inc. v. Cigna Health & Life Insurance Co.* is one such case. 103 F.4th 597 (9th Cir. 2024). The parties' arguments center largely on *Bristol*'s applicability. We consider *Bristol* separately, as its

practical consideration of congressional intent, keeping in view the particulars of ERISA coverage and the competing interests of providers and ERISA-plan-covered employees.

## A

We consider first the "connection with" prong of the standard ERISA-preemption analysis, as it is more straightforward and easier to apply.

"[T]he Supreme Court has not provided a succinct definition of, or analytical framework for, evaluating the phrase 'connection with.'" *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1082 (9th Cir. 2009). Instead, we consider "the objectives of the ERISA statute," *Gobeille*, 577 U.S. at 320 (citations omitted), and "presum[e] that Congress does not intend to supplant . . . state laws regulating a subject of traditional state power," *id.* at 325 (citation omitted). To do this, our court employs a "relationship test." *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1031 (9th Cir. 2021). Key to this test is understanding that ERISA "comprehensively regulates certain *relationships*." *Gen. Am. Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1521 (9th Cir. 1993). The relationship test determines whether Congress intended to preempt state laws by addressing whether "the claim bears on an ERISA-regulated relationship, *e.g.*, the relationship between plan and plan member, between plan and employer, between employer and employee." *Bafford*, 994 F.3d at 1031 (quoting *Paulsen*, 559 F.3d at 1082). For example, in the in-network context, breach of contract claims premised on stand-alone contractual agreements between providers and insurers do not implicate "connection

---

pertinence to this case is best understood after we have surveyed the operation of ERISA preemption standards more broadly.

with" preemption. Providers are not ERISA-entities, and such written agreements therefore do not govern ERISA relationships. *See Blue Cross of Cal.*, 187 F.3d at 1054.

*Depot, Inc. v. Caring for Montanans, Inc.* provides another example of the application of the relationship test. 915 F.3d 643. The plaintiffs in *Depot* were employers in Montana who provided their employees with health insurance coverage under employee benefit plans administered by the defendant health insurance companies. *Id.* at 650. During contract negotiations, the insurers represented to the employers that monthly insurance premiums for the employee benefit plans would include only the cost of benefits, a representation upon which the plaintiffs relied when agreeing to participate in the plan. *Id.* at 651. The employers later learned that such representations were false. The insurance companies, it turned out, "unlawfully padded the premiums with two surcharges without [the] plaintiffs' knowledge or consent." *Id.* Plaintiffs sued, asserting several state law causes of action, including a negligent misrepresentation claim. *Id.* at 652.

Applying the relationship test, *Depot* held that ERISA did not preempt the state law claims. *Id.* at 666–67. We acknowledged that both the plaintiffs and defendants were ERISA entities, so the claim "involve[d] an ERISA-regulated relationship." *Id.* at 666. But the presence of such a relationship did not alone require preemption, because the "relationship [was] unrelated to plaintiffs' state-law claims, which focus[ed] on the misrepresentations made by defendants while they were operating 'just like any other commercial entity.'" *Id.* (quoting *Paulsen*, 559 F.3d at 1083). That holding aligns with the Supreme Court's admonishment not to apply the "connection with" test with "uncritical literalism." *Travelers*, 514 U.S. at 656. The

negligent misrepresentation claim in *Depot* certainly bore a "connection with" an ERISA plan in the most literal sense of those words. Indeed, the lawsuit centered on two ERISA entities disputing premiums charged for an ERISA plan. But the *claim itself* arose from representations made by the defendant to the plaintiffs during negotiations before a plan ever existed, so "no such relationship existed when the misrepresentations were made." *Id.* at 667. The claim thus did not bear upon an ERISA relationship.

We reach a similar conclusion here. To be sure, as in *Depot*, ERISA-covered actors are relevant to HAMOC's claim. Aetna and WSP are ERISA-regulated entities, both of whom owe fiduciary duties to the patient who received surgery at La Peer. La Peer called Aetna to verify coverage under the patient's ERISA-covered plan. So, under a literal application of the words "connection with," HAMOC's negligent misrepresentation claim is "connected with" an ERISA plan because La Peer has a relationship with three ERISA-covered entities: La Peer is "connected with" the patient, by way of the medical services provided; with Aetna, as La Peer placed a verification call to Aetna; and with WSP, by dint of the claim it submitted to WSP for medical services provided to the patient. But we are skeptical that such an application of the "connection with" test— which of course is not enunciated in the statute itself—would align with ERISA preemption case law. *Cf. Travelers*, 514 U.S. at 656. Rather, as in *Depot*, the pertinent question is not whether an ERISA-regulated relationship exists but whether the *claim itself* bears upon that relationship. It does not.

Section 502(a) authorizes specific parties to sue and, correspondingly, subjects certain parties to liability. Section 502(a) authorizes participants and beneficiaries (here, the patient) to sue for lost benefits, thereby exposing plan

administrators and fiduciaries (here, Aetna and WSP) to liability. Section 502(a), however, does not supply a cause of action to providers, indicating that the relationship between La Peer, a provider, and Aetna, a plan administrator, is not one that Congress intended to "comprehensively regulate[]." *Castonguay*, 984 F.2d at 1521. Unlike the relationship between plans, participants, beneficiaries, trustees, and fiduciaries, the relationship between La Peer, a medical service provider, and Aetna, a plan administrator, falls outside ERISA's regulatory scope. *See id.* at 1521; *Bafford*, 994 F.3d at 1031–32; *Paulsen*, 559 F.3d at 1083. And the tort alleged, negligent misrepresentation, runs from a non-ERISA entity (La Peer) to ERISA entities (WSP and Aetna). *See Paulsen*, 559 F.3d at 1083. Further, the claim does not encroach upon an ERISA relationship, like that between Aetna and the patient beneficiary. HAMOC's claim concerns only representations that Aetna made as a plan provider to a third-party physician. *Blue Cross of Cal.*, 187 F.3d at 1054.

Accordingly, the negligent misrepresentation claim does not "bear on an ERISA-regulated relationship." *Depot*, 915 F.3d at 667 (citation modified). For that reason, as we discuss further in the course of the "reference to" analysis, *see infra* pp. 20–22, the negligent misrepresentation claim will not "result in a multiplicity of regulation, Congress's chief concern in enacting the ERISA pre-emption statute." *Paulsen*, 559 F.3d at 1083. Because HAMOC's negligent misrepresentation claim does not focus on an ERISA-regulated relationship, the claim is not preempted under the "connection with" test.

**B**

"A state-law claim has a 'reference to' an ERISA plan if it 'is premised on the existence of an ERISA plan' or if 'the existence of the plan is essential to the claim's survival.'" *Depot*, 915 F.3d at 665 (citation modified) (quoting *Or. Teamster Emps. Tr. v. Hillsboro Garbage Disposal, Inc.*, 800 F.3d 1151, 1155–56 (9th Cir. 2015)). Congress intended ERISA's preemption clause to "ensure that plans and plan sponsors would be subject to a uniform body of benefits law . . . to minimize the administrative and financial burden of complying with conflicting" state and federal laws. *Ingersoll-Rand*, 498 U.S. at 142. In line with that purpose, "reference to" preemption typically arises in two contexts.

First, ERISA preempts state laws that directly regulate or condition a regulation on the existence of an employee benefit plan or a benefit under such a plan. State laws that impose obligations "by reference to [ERISA] covered programs must yield to ERISA." *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130–31 (1992); *cf. WSB Elec., Inc. v. Curry*, 88 F.3d 788, 792–94 (9th Cir. 1996). This category includes laws that "expressly refer[]  to," "solely appl[y] to," or "single[] out . . . for different treatment" employee benefit plans covered by ERISA; an example is a state statute that prohibits collection agencies from garnishing funds held in ERISA-governed pension plans but does not provide similar protections to non-ERISA plans. *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 829–30 (1988). Also in this category are statutes that "regulate[] a type of benefit of an ERISA plan" or require employers "to create a separate benefit plan"—for example, a statute that requires employers to modify employee benefit plans to provide employees with coverage for specific medical procedures. *Aloha Airlines, Inc. v. Ahue*,

12 F.3d 1498, 1504–05 (9th Cir. 1993). Such statutes encroach upon ERISA's "uniform regulatory regime over employee benefit plans." *Davila*, 542 U.S. at 208. By contrast, ERISA does not preempt state statutes that "function[] irrespective of" or are "indifferent to . . . ERISA coverage." *Cal. Div. of Lab. Standards Enf't*, 519 U.S. at 328 (citation omitted).

Second, ERISA preempts state common law claims where the alleged injury flows entirely from the denial of a benefit, the breach of a duty, or some other failure to comply with a requirement imposed by ERISA. Accordingly, we have held that the "reference to" prong preempts state law claims that operate as "alternative enforcement mechanisms" to § 502(a)'s comprehensive civil enforcement scheme, *Dishman*, 269 F.3d at 981 (citation omitted); that "challenge the administration of ERISA plan benefits," *Greany*, 973 F.2d at 818; or that are "premised on the existence of an ERISA plan" such that the plan "is essential to the claim's survival," *Depot*, 915 F.3d at 665 (citation omitted).

What all of this means is, unfortunately, fairly opaque. But for our purposes, this analysis asks us, in essence, to determine whether the claim at issue is the sort that a participant, beneficiary, or their assignee could have asserted as a § 502(a) benefits claim or is otherwise dependent on an ERISA-covered plan.[10] If not, then the state law claim can

---

[10] The Fifth Circuit has characterized this inquiry as whether the state law claims "address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan" and "directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 245 (5th Cir. 1990).

stand alone without "reference to" an ERISA plan and is not preempted, because it seeks to remedy an injury to a third-party, not to a beneficiary or the covered plan. *See The Meadows*, 47 F.3d at 1010 ("ERISA does not preempt a third-party provider's independent state law claims against a plan precisely because those claims do not 'relate to' the administration of an ERISA plan."); *see also Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 244–48 (5th Cir. 1990) (declining to extend ERISA preemption "to encompass third-party providers" asserting state law misrepresentation claims).

We now address whether HAMOC's negligent misrepresentation claim has a "reference to" an ERISA plan. We do so by looking closely at cases that have applied the "reference to" test under facts analogous to those presented here.

Many common themes run through these cases. Important among them is the observation that in almost every case, a literal or strict application of the words "reference to" would have supported preemption. Also, in most instances, the "reference to" test acted as a constraint upon, rather than an expansion of, ERISA's preemption clause.

*The Meadows v. Employers Health Insurance* applied the "reference to" prong of ERISA preemption to a negligent misrepresentation claim. 47 F.3d at 1010. This case involves the same state law tort. Also like this case, *The Meadows* involved a healthcare provider's (The Meadows) misrepresentation claim against an insurer (Employers Health) arising from statements the insurer made on a verification call. *Id.* at 1007.

In early 1990, The Meadows placed calls to Employers Health to determine whether two of its patients were eligible for coverage. Employers Health confirmed the patients' coverage on those calls and sent letters to The Meadows, similarly confirming coverage. *Id.* at 1007–08. As it turned out, the patients had lost coverage the year before. When The Meadows sought payment for the medical services it provided, the insurer refused payment, pointing out that, "[d]espite [Employers Health's] oral and written representations of coverage," the patients were not insured at the relevant time. *Id.* at 1008. The Meadows brought three state law causes of action including, as relevant here, a negligent misrepresentation claim. *Id.*

Addressing "reference to" preemption, *The Meadows* reasoned that "neither The Meadows nor the [patients] had any existing ties to the ERISA plan in 1990" when The Meadows called Employers Health, *id.* at 1009, as the patients were not then covered by the ERISA plan. That the patients were not ERISA beneficiaries when the misrepresentations were made and so could not have asserted or assigned their rights under § 502(a) was "further reason to conclude that The Meadows' claim does not 'relate to' the provisions of the ERISA plan." *Id.* at 1010. And critically, the negligent misrepresentation claim "arose because there was no plan coverage for the [patients], which was the very fact misrepresented by Employers Health, to the detriment of The Meadows." *Id.* In other words, the claim arose not from the denial of benefits but from the fact of the misrepresentation itself. But for that misrepresentation, The Meadows would not have provided treatment and so would not have incurred an uncompensated financial obligation. Given that context, the claim could "function irrespective of the existence of an ERISA plan."

*Id.* (citation modified). *The Meadows* held that ERISA does not "preempt[] claims by a third-party who sues an ERISA plan not as an assignee of a purported ERISA beneficiary, but as an *independent* entity claiming *damages*." *Id.* at 1008.

As we mentioned above with regard to the "connection with" rule in our discussion of *Depot*, *see supra* pp. 17–18, a literal application of the phrase "reference to"—again, not a statutory phrase—in *The Meadows* might have required preemption. Indeed, the patients in *The Meadows* were covered up to 1989 by an ERISA plan, and when The Meadows asked Employers Health about plan coverage, Employers Health "had to check the [patients'] policy." 47 F.3d at 1010. Looking to the plan to confirm coverage was literally a "reference to" the plan documents themselves. Employers Health argued that such "conduct by its agents implicated the administration of the ERISA plan," thus requiring "reference to" preemption. *Id.*

We held otherwise, seeing "no merit in this argument." *Id.* That an ERISA entity needed to, and did purport to, "verify coverage" under an ERISA plan was insufficient, we held, to justify preemption. *Id.* Had we concluded to the contrary, our holding in *The Meadows* would have been at odds with the understanding that "reference to" preemption is ordinarily a constraint upon ERISA's preemption clause, not an expansion to the limits of the "relate to" term in the statute. *See Travelers*, 514 U.S. at 655.

Our holding in *Cedars-Sinai Medical Center v. National League of Postmasters* reflects a similar understanding of the "reference to" test. 497 F.3d 972 (9th Cir. 2007). Cedars-Sinai, a medical services provider, entered into a contract with PBP Health, a plan administrator. PBP Health verified coverage for one of Cedars-Sinai's patients on four separate

occasions. *Id.* at 974. Each time, PBP Health "authorized Cedars-Sinai to perform medical services." *Id.* After Cedars-Sinai submitted claims, PBP Health paid less than 25 percent of the total claim amount. *See id.* Cedars-Sinai sued, asserting several state law causes of action, including a negligent misrepresentation claim.

Unlike HAMOC's claims, Cedars-Sinai's claims involved a federal health benefit plan governed by the Federal Employee Health Benefits Act ("FEHBA"), so we addressed preemption under FEHBA's preemption provision, 5 U.S.C. § 8902(m)(1). *Cedars-Sinai*, 497 F.3d at 975. But to conduct that analysis, *Cedars-Sinai* addressed ERISA's preemption clause and cases interpreting it at length, as "FEHBA's preemption provision closely resembles ERISA's express pre-emption provision, and precedent interpreting the ERISA provision thus provides authority for cases involving the FEHBA provision." *Id.* at 977 n.2 (citation modified).

Two points stand out in *Cedars-Sinai*'s preemption analysis as pertinent here. First, a literal application of the words "relate to" under FEHBA's preemption clause might have supported preemption in *Cedars-Sinai*. The patient was covered by a FEHBA plan, which PBP Health referenced when it authorized Cedars-Sinai to perform medical services under the plan terms. *See id.* at 974. In that sense, the state law claims "related to" a regulated benefits plan. But FEHBA did not preempt those claims, we held, because the claims "arose" not from the FEHBA plan, but "from PBP Health's contractual obligation to Cedars-Sinai—an obligation that arose when PBP Health represented that [the patient] was covered by the Plan." *Id.* at 977. Cedars-Sinai, we stressed, brought the claims as a "third-party hospital," not as a "covered individual or other relevant party under

FEHBA or its implementing regulations," and Cedars-Sinai "[did] not have [any] remedy under the statute." *Id.* (citation modified).

Second, and relatedly, *Cedars-Sinai*, citing ERISA preemption caselaw, emphasized that ERISA does not preempt "nonderivative [state law] claims" asserted by a "third-party" where such claims could not have been assigned by an ERISA beneficiary in the first instance. *Id.* at 980. Because Cedars-Sinai's claim arose from the obligation triggered by PBP's representation, *id.* at 977, the claim was nonderivative—that is, it was not a claim the patient could have assigned to Cedars-Sinai. Such claims do not "relate to" an ERISA plan, *Cedars-Sinai* held, because the claim "could stand alone absent any issue regarding the application of a welfare benefit plan." *Id.* at 978 (quoting *Mem'l Hosp. Sys.*, 904 F.2d at 239). In that regard, Cedars-Sinai, like the plaintiff in *The Meadows*, was suing as an "independent entity claiming damages," not as a "third party . . . assignee of a purported ERISA beneficiary." *Id.* (quoting *The Meadows*, 47 F.3d at 1008).

The facts here also are similar to those in *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 383–84 (5th Cir. 2011), *vacated*, 678 F.3d 940 (5th Cir.), *reinstated on reh'g*, 698 F.3d 229 (5th Cir. 2012) (en banc). We therefore consider that case's analysis although it is not binding upon us.

Access Mediquip was a medical device provider. *Id.* at 378. Before procuring medical devices for three patients, Access verified coverage with the insurer, United. *Id.* at 378–79. United represented that it would pay for the devices, representations upon which Access relied when it procured and provided a series of medical devices. *Id.* at 379. But

when Access filed claims, United refused to pay. *Id.* at 379–80. United denied Access's claims pursuant to a preexisting policy that "required denying all claims for surgically implanted devices billed by providers who are not surgical facilities." *Id.* at 381.

Access brought a state law claim for negligent misrepresentation, [11] *id.* at 380, alleging that United's statements, although "superficially about coverage under [an ERISA] plan, were in their practical context assurances that Access could expect to be paid reasonable charges" it incurred on behalf of United's insureds, *id.* at 381. *Access Mediquip* held that ERISA did not preempt the claim, *id.* at 387, because the "*merits* of Access's misrepresentation claims [did] not depend on whether its services were or were not fully covered under the patients' plans," *id.* at 385 (emphasis added). Rather, Access's claims depended on United's representations or omissions and whether it was reasonable for Access to rely on those statements. *Id.*

As in *The Meadows* and *Cedars-Sinai*, the claims in *Access Mediquip* literally referred to an ERISA benefits plan. Access called United to verify its patients' coverage under the terms of an ERISA plan. United authorized treatment under the plans, provided billing codes, and upon denying Access's claims, sent Access an "Explanation of Benefits" document explaining the denial by invoking the terms of the ERISA plan. *See id.* 379–80. Declining to apply the "reference to" test with "uncritical literalism," the Fifth Circuit held that ERISA did not preempt Access's negligent misrepresentation claim. *Id.* at 382 (quoting *Travelers*, 514 U.S. at 656). Although an ERISA plan was centrally

---

[11] Access also brought claims for promissory estoppel and quantum meruit, among others. *Access Mediquip*, 662 F.3d at 377.

involved in the dispute, the court held, the "grievance underlying [Access's] state law misrepresentation claims [was] the inconsistency between United's representations and its conduct after Access submitted claims for reimbursement for its services," not the denial of benefits itself. *Id.* at 381.

HAMOC's negligent misrepresentation claim bears close resemblance to the negligent misrepresentation claims in *The Meadows*, *Cedars-Sinai*, and *Access Mediquip*. In all of those cases, as here, a regulated employee benefit plan and regulated parties were of some relevance to the state law claim at hand: All three cases involved a third-party provider—here La Peer—verifying with an ERISA plan administrator—here Aetna—the existence or extent of coverage under the plan—here the one provided by WSP. In all three cases, the plan administrator made representations about coverage to the provider upon which the provider relied in providing services. Those representations turned out to be false, to the detriment of the provider.

In all three cases, the claims made "reference to" an ERISA (or FEHBA) plan in the literal sense of that nonstatutory phrase. In *The Meadows*, Employers Health needed to "verify coverage" under the patient's former policy. 47 F.3d at 1010. In *Cedars-Sinai*, PBP Health "authorized Cedars-Sinai to perform medical services" under the patient's benefit plan. 497 F.3d at 974. And in *Access Mediquip*, United promised to pay for medical devices pursuant to the policies of its ERISA-plan-covered insureds. 662 F.3d at 379–81. Here, La Peer called Aetna to verify the rate at which the plan would reimburse a surgical procedure for a patient insured under an ERISA plan; the representation regarding the coverage rate was necessarily a representation about the provisions of that plan. The three

cases surveyed held that ERISA did not preempt the negligent misrepresentation claim triggered by reliance on misrepresentations made in verification calls. We so hold as well.

As in *The Meadows*, *Cedars-Sinai*, and *Access Mediquip*, a close focus on the elements of the negligent misrepresentation claim asserted here undergirds our conclusion. Under California law, a plaintiff bringing a cause of action for negligent misrepresentation must show that the defendant misrepresented a material fact "without reasonable ground for believing it to be true" and with intent to induce the plaintiff's reliance. *Home Budget Loans, Inc. v. Jacoby & Meyers L. Offs.*, 207 Cal. App. 3d 1277, 1285 (1989); *see Small v. Fritz Cos.*, 30 Cal. 4th 167, 173–74 (2003). The plaintiff must also show such reliance was justifiable and resulted in damage. *Home Budget Loans*, 207 Cal. App. 3d at 1285. HAMOC sufficiently alleges those elements by stating (1) that Aetna's representation to La Peer that it would reimburse at the UCR rate was a misrepresentation because, despite its statement to the contrary, Aetna knew at the time of the verification call that the plan would reimburse La Peer at the much lower Medicare rate, and (2) that La Peer would not have performed the surgery and incurred a financial loss had Aetna correctly stated its intended rate of reimbursement.

HAMOC's negligent misrepresentation claim, as recited above, does not hinge on the denial of benefits *to the patient* from an ERISA plan. In fact, the patient here received the covered treatment. Rather, the negligent misrepresentation claim arises from "the very fact misrepresented by" Aetna, *The Meadows*, 47 F.3d at 1010, that it would reimburse La Peer at the UCR rate—without any reasonable ground to believe the veracity of that promise. Or, as alleged in the

complaint, "Aetna knew that [it] would be paying [La Peer] at a Medicare rate" despite its statements to the contrary. HAMOC thus asserts that WSP and Aetna's "obligation" to La Peer "arose when [Aetna] *represented* that [the patient] was covered by the Plan," not from its actual obligation under the plan. *Cedars-Sinai*, 497 F.3d at 977 (emphasis added). Put another way, HAMOC's "grievance" is the "inconsistency" between Aetna's statements and its later conduct. *Access Mediquip*, 662 F.3d at 381. Because the injury alleged is not rooted in a plan term, HAMOC's claim against Aetna and WSP is not one that the patient could have assigned to a third-party under § 502(a). The claim is therefore inherently "nonderivative," *Cedars-Sinai*, 497 F.3d at 980, as La Peer (and HAMOC in La Peer's stead) "does not have a remedy under the statute," *id.* at 977. Given these features, HAMOC's negligent misrepresentation claim is not one Congress could have intended to route through ERISA's civil enforcement scheme. HAMOC is simply an "*independent* entity claiming *damages*." *The Meadows*, 47 F.3d at 1008.

Recognizing again that the indistinct nature of the "reference to" test renders it difficult to apply with abundant confidence, we highlight three contextual points that further support our conclusion:

First, under California negligent misrepresentation law, HAMOC must show that Aetna lacked a "reasonable ground for believing" the truth of its statements. *Home Budget Loans,* 207 Cal. App. 3d at 1285. It is possible that the parties may "reference" the plan to contest that element. For example, if there is a provision in the plan that clearly specifies that the plan will pay the Medicare rate in relevant circumstances, that provision may be evidence of the merits of HAMOC's case. But "[w]here the meaning of a term in

the Plan is not subject to dispute, the bare fact that the Plan may be consulted in the course of litigating a state-law claim does not require that the claim be extinguished by ERISA's enforcement provision." *Blue Cross of Cal.*, 187 F.3d at 1051; *accord Access Mediquip*, 662 F.3d at 386 (noting that "consultation of the plan[,] . . . without more, does not require preemption"). Nor do the plan terms bear upon whether it was reasonable for La Peer to rely on Aetna's statements; neither Aetna nor WSP provided La Peer with a copy of the patient's plan before surgery.

Second, as in *Access Mediquip*, to prevail on its negligent misrepresentation claims, HAMOC "need not show that [Aetna] breached the duties and standard of conduct for an ERISA plan administrator," as the claim does not depend on the terms of the patient's plan. 662 F.3d at 385. It is consequently largely "immaterial whether the alleged statements regarding . . . cover[age] . . . were correct or incorrect as descriptions of the plans' terms." *Id.* What matters instead is what Aetna believed to be true at that time and whether detrimental reliance resulted from the discrepancy between the representation and the truth.

For this reason, *The Meadows* is closely analogous to this case, even though the patients there, unlike here, lacked any ERISA-governed-plan coverage. In both instances, the claim for damages arises from "the very fact misrepresented" by the insurer, not from the terms—or lack thereof—of any underlying ERISA plan. *The Meadows*, 47 F.3d at 1010. WSP's plan might specify a reimbursement amount for the patient's surgery, or it might state that the patient's plan does not cover the surgery at all. In either scenario, ERISA would not preempt HAMOC's negligent misrepresentation claim because the claim turns on what Aetna said, what La Peer reasonably believed, and what actions La Peer took, not the

plan's actual coverage terms. "As assurances of how much [La Peer] would be paid, [Aetna's] statements are belied by [its] subsequent refusal to reimburse" La Peer's services at the rate it had represented. *Access Mediquip*, 662 F.3d at 385. A misrepresentation regarding the existence of coverage causes the same financial injury to a provider as a misrepresentation about the extent of coverage. *See, e.g.*, *id.* at 384 & n.7 (collecting cases rejecting "an existence-versus-extent approach"); *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1534 (11th Cir. 1994) (applying *Memorial Hospital*, a no-coverage case, in an extent of coverage case); *In Home Health, Inc. v. Prudential Ins. Co. of Am.*, 101 F.3d 600 (8th Cir. 1996) (same).

Third, it is unlikely that consultation, application, or construction of WSP's plan will be necessary to determine damages, "given that the compensatory recovery [HAMOC] seeks can be measured by the cost of the services it alleges [Aetna] induced it to provide." *Id.* at 386. California limits damages in negligent misrepresentation cases to costs "which will compensate for all the detriment proximately caused" by the alleged tort. *Branch v. Homefed Bank*, 6 Cal. App. 4th 793, 800 (1992) (citation omitted). HAMOC seeks compensatory and restitution damages representing the value of the services La Peer rendered. Those figures are untethered to any plan term. And even if reference to the plan terms proved necessary to calculate HAMOC's damages, that exercise would not require preemption. "[A] claim does not 'relate to' an ERISA employee benefit plan simply because a court would refer to the plan in calculating damages." *Funkhouser v. Wells Fargo Bank, N.A.*, 289 F.3d 1137, 1143 (9th Cir. 2002).

We conclude that HAMOC's negligent misrepresentation claim is not preempted under ERISA's

"reference to" test. Our conclusion is in line with those of several other circuits, in addition to the Fifth Circuit in *Access Mediquip,* that have considered whether ERISA preempts a state law negligent misrepresentation claim. *See, e.g.*, *Mem'l Hosp. Sys.*, 904 F.2d 236; *In Home Health.*, 101 F.3d 600; *Lordmann Enters*, 32 F.3d 1529.

## C

As noted earlier, the "connection with" and "reference to" rubrics have left ERISA's "relate to" clause in a state of imprecision. Ultimately, "the question whether a certain state action is pre-empted by federal law is one of congressional intent. The purpose of Congress is the ultimate touchstone." *Ingersoll-Rand*, 498 U.S. at 137–38 (citation modified) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985)). To close the loop, we now explain why the result we reach applying the "connection with" and "reference to" analyses accords with the underlying premises of ERISA preemption.

We begin with the 30,000-foot view: How might this case be different if the patient here did not receive insurance through an employer?

If the patient purchased the relevant medical insurance plan directly from Aetna, paying out of pocket, then the health insurance plan would not constitute an employee benefit plan subject to ERISA oversight, and ERISA's preemption clause would be irrelevant. Under otherwise identical facts, there is no doubt that HAMOC's state law claim could proceed. That is, La Peer could seek a remedy under California state law for the damage incurred due to Aetna's alleged misrepresentations.

So the question is: Did Congress intend to limit an out-of-network provider like La Peer's ability to recover under a negligent misrepresentation claim to situations where the patient's insurance was employer-sponsored, rather than privately acquired? Nothing in ERISA or its history suggests that result.

First, when it enacted ERISA, Congress recognized "that the continued well-being and security of millions of employees and their dependents are directly affected by [employee benefit] plans." 29 U.S.C. § 1001(a). ERISA thus "protect[s] . . . the interests of participants in [such] plans and their beneficiaries, . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." *Id.* § 1001(b). Invoking ERISA preemption to deny a remedy for a negligent misrepresentation by the plan administrator does not serve those ends. Recall that providers are not ERISA-governed entities and so have no rights under ERISA. Where a provider performs services it might otherwise decline to provide in reliance on a plan's misrepresentation, ERISA provides no remedy. Nor would a beneficiary's assignment of their ERISA rights to the provider offer meaningful relief for the damage the provider incurred due to the plan's misrepresentation. Because ERISA entitles a beneficiary to sue for *plan benefits*—not for whatever a plan may represent to a provider—beneficiaries cannot assign to providers the right to sue for negligent misrepresentation; the claim, as we have explained, is nonderivative. So the result of denying a remedy here is to permit ERISA plans or plan administrators with impunity to negligently misrepresent the extent of coverage to healthcare providers, inducing the providers to perform services they otherwise might decline to provide. Sanctioning such behavior by plans or plan administrators

directly undermines Congress's stated objective of "establishing standards of conduct, responsibility, and obligation" for plan fiduciaries. *Id.* "[I]nsulating plan fiduciaries from the consequences of their own misrepresentations to third-party providers does not further any of ERISA's objectives." *The Meadows*, 47 F.3d at 1010.

Second, "one of the major purposes of ERISA [is] to make health care less expensive and more widely available." *Id.* at 1011. A patient's ability to assign their ERISA rights to an out-of-network provider directly furthers this interest. "Such assignments . . . protect beneficiaries by making it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment, and by eliminating the necessity for beneficiaries to pay potentially large medical bills and await compensation from the plan." *Misic*, 789 F.2d at 1377. But, as noted previously, plans regularly include provisions that prevent beneficiaries from making such assignments. *See, e.g.*, *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 228–29 (3d Cir. 2020). In such a scenario, preemption of a negligent misrepresentation claim would leave providers with no recourse—under either state law or ERISA—when they rely on a plan's coverage representations that later prove false. Where a patient's plan includes an anti-assignment provision, providers would simply be stuck with the bill, regardless of what the plan administrator told them.

That risk has real consequences for the expense and availability of health care to employees covered by ERISA plans. "[T]hird-party providers would be less likely to accept the risk of nonpayment, and as a result, might require patients to make up-front payments or subject those patients to other unnecessary inconveniences before treatment is offered." *Cedars-Sinai*, 497 F.3d at 979 n.3. In other words,

preemption here could result in less convenient and more expensive medical services for ERISA-plan-covered patients—but not purchasers of individual insurances—who visit out-of-network providers. Such an outcome "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 114 (1989), frustrating ERISA's fundamental purpose—protecting the benefit plan interests of employees and their beneficiaries.

\* \* \*

For all these reasons, HAMOC's negligent misrepresentation claim does not "relate to" an employee benefit plan, and ERISA does not displace HAMOC's negligent misrepresentation claim.

## IV

Aetna and WSP's principal response to everything we have said thus far is that this court held otherwise in *Bristol*, 103 F.4th 597. Not so. Most critically, *Bristol* did not involve a negligent misrepresentation claim. Nor could it have, due to the circumstances of the case. And the *Bristol* opinion expressly left open whether a state law negligent misrepresentation claim asserted on behalf of a medical provider who placed a verification call to an insurer would be preempted by ERISA.

The circumstances in *Bristol* in some respects resemble those here, but only up to a point. Plaintiff Bristol SL Holdings, Inc. (Bristol) was the successor in interest to Sure Haven, Inc., a drug rehabilitation and mental health facility. *Id.* at 600. Sure Haven provided out-of-network services to individuals covered by Cigna-administered, ERISA-governed health insurance plans. *Id.* Before accepting a

Cigna-covered patient, Sure Haven "would place a 'verification call' to Cigna to determine whether the patient qualified for out-of-network benefits and to find out the applicable reimbursement rate." *Id.* On those calls, Cigna regularly told Sure Haven that it would reimburse covered services at a set percentage of the UCR rate. *Id.* After confirming coverage, treatment authorization, and the reimbursement rate with Cigna, Sure Haven would proceed with treatment. *Id.*

Here is where the resemblance between *Bristol* and this case dissipates: After some years, Cigna began to refuse future reimbursements to Sure Haven for services of the same kind it had previously authorized. The reason: Having paid the represented rate for some years, Cigna eventually "became suspicious that Sure Haven" was engaging in "fee-forgiving," that is, "improperly failing to collect the financial contributions (co-pays, deductibles, etc.) that plan participants were required to pay under [their] plans." *Id.* Fee-forgiving inflates insurance costs by "eliminating the financial incentive for patients to seek cheaper in-network care." *Id.* The Cigna-administered healthcare plans therefore all contained "contractual language [that] permit[ted] Cigna to deny claims on account of fee-forgiving." *Id.* Sure Haven continued to place verification calls with Cigna, and Cigna would confirm both coverage and a rate of reimbursement on those calls. But, exercising the fee-forgiving provisions, Cigna also notified Sure Haven that, going forward, it would have to document its fee collection efforts each time it filed a claim. Cigna denied all claims lacking such documentation, including for patients whose treatment Cigna had earlier authorized and paid for. *Id.*

Bristol sued Cigna as Sure Haven's successor in interest. Like HAMOC, Bristol asserted an ERISA benefits claim and

several state law claims. *Id.* at 601. But Bristol did not assert a misrepresentation claim. It could not have done so, as Cigna did not have reason to suspect fee-forgiveness when it first made representations about coverage and the reimbursement rate and, when it did have that knowledge, instituted procedures for the future to determine whether fee-forgiveness had occurred. Bristol's state law alleged causes of action were instead state law contract and promissory estoppel claims, premised on the theory that Cigna's representations during the earlier preauthorization calls created oral contracts committing Cigna to reimburse Sure Haven at a specific rate for future services to those patients.

*Bristol* held that ERISA preempted the state law breach of contract and promissory estoppel claims. The underlying Cigna-administered ERISA plans governed the terms of Sure Haven's reimbursement. Sure Haven called to Cigna to inquire "whether reimbursement was available under the ERISA plans" and sought preclearance for "plan-covered services." *Id.* at 603. Neither party disputed that the ERISA plan "permit[ed] Cigna to deny claims on account of fee-forgiving," *id.* at 600, and Cigna denied coverage on that basis. Bristol's oral contract theory thus sought to supplant the terms of an ERISA plan—a contract that expressly permitted Cigna's denial of coverage—with a new agreement obligating Cigna to pay, Sure Haven's fee-forgiveness notwithstanding. *Bristol* held that ERISA preempted both the contract claim and the promissory estoppel claim. *Id.* at 604.

## A

We agree with WSP and Aetna that ERISA preempts HAMOC's California state law claim of promissory estoppel under our holding in *Bristol*. As we have highlighted, the

facts here are in some respects analogous to those presented in *Bristol*. And here, as in *Bristol*, both parties assert a promissory estoppel claim under California law; the causes of action are therefore analogous in all legally meaningful respects. For that reason, we hold that *Bristol* controls the promissory estoppel preemption question in this case and affirm the district court's dismissal of HAMOC's promissory estoppel claim.

**B**

We conclude otherwise with respect to the impact of *Bristol* on HAMOC's negligent misrepresentation claim.

First and most important, *Bristol* expressly did not reach negligent misrepresentation causes of action arising from out-of-network providers' verification calls to ERISA plan administrators:

> Some circuits have permitted providers' state law claims for misrepresentation of health coverage to proceed when the patients were covered by an ERISA plan, but—contrary to the insurer's representations—lacked coverage for the specific treatment rendered. *See, e.g.*, *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 224 (3d Cir. 2020); *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 383–84 (5th Cir. 2011); *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1533–34 (11th Cir. 1994). This line of authority is . . . distinguishable from this case. Here, there is no evidence . . . that Cigna misrepresented patient coverage, or the extent of coverage,

> during the calls. . . . Reimbursement was
> instead denied because Cigna later
> determined that Sure Haven had engaged in
> fee-forgiving, in violation of plan terms.

*Id.* at 607.[12] As *Bristol* explicitly disavowed deciding the issue in this case, it does not govern HAMOC's negligent misrepresentation claim.

Further, in distinguishing negligent misrepresentation claims from the oral contract cause of action there at issue, *Bristol* cited *Access Mediquip*, the Fifth Circuit case we found persuasive in our ERISA preemption analysis. *See supra* pp. 26–28. Comparing the facts of *Bristol* and *Access Mediquip* to the facts here demonstrates why the reasoning of *Access Mediquip*, *Cedars-Sinai*, and *The Meadows* governs this case, and the holding of *Bristol* does not.

*Bristol*'s oral contract theory directly contradicted the fee-forgiving term in Cigna's plan. The state law oral contract claim in *Bristol* was thus an attempt to supplant the terms of an ERISA plan with a new, legally enforceable agreement. *Id.* This displacement in favor of an individual, contradictory agreement would fundamentally undermine the uniformity of administration that is a preeminent concern of ERISA and of ERISA preemption. *Depot*, 915 F.3d at 666. And Sure Haven's "defense on the merits" of Cigna's claim denial was "that it did not engage in fee-forgiving." *Bristol*, 103 F.4th. at 600. So, as *Bristol* noted, Cigna's

---

[12] *Bristol* did not mention *Cedars-Sinai*. Nor did it invoke *The Meadows* among the negligent misrepresentation cases mentioned at this juncture, concluding instead that "*The Meadows* . . . has no bearing on" *Bristol*'s breach of contract and promissory estoppel claims. *Bristol*, 103 F.4th at 606.

plan—as the controlling contract—was "central to the state law claims." *Id*. at 604. As the state law contract claim could not co-exist with the ERISA plan, it was preempted.

By contrast, the misrepresentation claim for this case arises from an injury distinct from compliance or noncompliance with the ERISA plan or any contractual substitute for the ERISA plan: Aetna's alleged misrepresentation and La Peer's detrimental reliance thereon. *See supra* pp. 29, 31. Unlike in *Bristol*, HAMOC does not seek to supplant with a new contract a plan provision under which Aetna denied coverage. Instead, HAMOC's negligent misrepresentation cause of action is one by an independent entity claiming damages untethered to the denial of benefits to the beneficiary.

Next, *Bristol*'s timeline, distinct from how events unfolded here, also demonstrates why the state law contract cause of action there was displaced in accord with ERISA preemption principles. In *Bristol*, Cigna denied coverage only after Sure Haven filed claims unaccompanied, as had been requested, by evidence of its efforts to collect payments from its patients. That is, the contours of Sure Haven's fee-forgiving did not become apparent until after it had submitted those claims. *See Bristol*, 103 F.4th at 600–01. Only then could Cigna assess whether Sure Haven had filed sufficient documentation. That timing explains why a negligent misrepresentation claim was unavailable in *Bristol*.

Negligent misrepresentation requires showing that a defendant had no reasonable basis for believing the truth of its misleading statement *at the time the statement was made*. *See Home Budget Loans*, 207 Cal. App. 3d at 1285. In *Access Mediquip*, for example, the plaintiff met that

requirement by alleging that United had "distributed a notice to its staff explaining that claims [like Access's] were to be denied" nearly two months "before Access contacted United regarding" coverage. 662 F.3d at 379–80. The representations were therefore misleading because United agents "omitted to mention that . . . Access's services would not be reimbursed" under the terms of United's plan. *Id.* at 385. HAMOC alleges, similarly, that Aetna knew at the time of the preauthorization call that it would not reimburse La Peer at the UCR rate.[13] In *Bristol*, by contrast, Cigna had no knowledge of Sure Haven's fee-forgiveness until after the initial preauthorization call had taken place. So, the independent injury at issue here did not occur in *Bristol*. Instead, Bristol sought directly to displace the provisions of the governing ERISA plan—which, as we have explained, it could not do.

Finally, all the considerations just recounted confirm that *Bristol*'s legal analysis does not control this case—as the opinion, again, expressly recognized. Bristol's breach of contract claim bore an impermissible "reference to" an ERISA plan because the alleged terms of the oral contract directly conflicted with—and attempted to supplant—the ERISA plan's fee-forgiving provision. And citing *Depot*, *Bristol* determined that the oral contract claim "governs a central matter of plan administration or interferes with nationally uniform plan administration," *Bristol* 103 F.4th at 604 (quoting *Depot*, 915 F.3d at 666), thereby meeting the

---

[13] We note that it is far from obvious that HAMOC's claim can succeed on the merits. HAMOC was not the medical services provider in this case. It will have to prove exactly what was asked, what was represented, what La Peer knew about how Aetna would apply either the UCR or Medicare rate, and whether Aetna and WSP intended to induce reliance. *Cf. Home Budget Loans, Inc.*, 207 Cal. App. 3d at 1285.

relationship test central to the "connection with" standard cited in *Depot*. Put another way, Bristol's oral contract theory—although in name premised on a contract between an ERISA entity (Cigna) and a non-ERISA entity (Sure Haven)—sought in reality to supplant a plan that governed the relationship between two ERISA entities—the patient and Cigna—and forbade fee-forgiveness to the patient. The oral contract in that respect regulated an ERISA relationship.

By contrast, the negligent misrepresentation claim at issue here does not encroach upon WSP's or Aetna's relationship with their insureds. The claim concerns only representations made by the plan administrator about the content of a plan and would not change the benefits due to the beneficiary. There is little risk that encouraging plan administrators to accurately represent plan terms to third parties will encroach upon the relationship between the plans and their insureds.

We conclude that *Bristol* does not preclude the negligent misrepresentation claim at stake in this case.

\* \* \*

HAMOC's negligent misrepresentation claim does not "relate to" the Aetna-administered plans. The district court's dismissal of these claims is **REVERSED**. We **AFFIRM** the district court's dismissal of HAMOC's promissory estoppel claim pursuant to our holding in *Bristol*. The case is **REMANDED** for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED in part, and REMANDED**.